J-A14033-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| LAKE ARIEL RECOVERY CENTER, LLC AND GINA IMBURGIO, IN HER INDIVIDUAL CAPACITY AND AS A MEMBER OF LAKE ARIEL RECOVERY CENTER, LLC | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| | : | No. 2695 EDA 2022 |
| v. | : : : | |
| C & E INVESTORS, INC., AVENUES RECOVERY CENTER, LLC AND HUDI ALTER | : : : : | |

Appeal from the Order Entered October 12, 2022
In the Court of Common Pleas of Wayne County
Civil Division at No(s): 2021-00279

BEFORE: PANELLA, P.J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:         **FILED JANUARY 10, 2025**

Lake Ariel Recovery Center, LLC ("LARC") and Gina Imburgio ("Imburgio") (collectively, "Appellants") appeal from the order granting summary judgment to C&E Investors, Inc. ("C&E"), Avenues Recovery Center, LLC ("ARC"), and Hudi Alter ("Alter") (collectively, "Appellees"). Following our review, we affirm.

The trial court provided the factual and procedural history of this case, which we set forth in relevant part as follows:

> . . . [Appellants maintained] that . . . C&E[] breach[ed] . . . [an] April 27, 2019 Real Estate Agreement [("the April 2019 Agreement"), pursuant to [which,] "Gina Marie Imburgio or assigns" was the buyer[, LARC was purportedly her intended assignee,] and [C&E] was the seller[,] of . . . property located at

50 Industrial Drive, Lake Ariel, PA [("the property")]. . . . [LARC is not mentioned in the April 2019 Agreement, however, Appellees] allege[d] that C&E breached the [April 2019] Agreement by failing to sell the property to [Imburgio,] and instead selling it to [ARC via an LLC that ARC had formed specifically for that purpose, called 50 Industrial Park, LLC ("50 Industrial Park"). In June 2019, ARC, via its then-CEO, Alter, executed a letter of intent to purchase the property from LARC, along with LARC's business assets, following the completion of Imburgio's and/or her intended assignee, LARC's, purchase of the property from C&E. However, as explained further below, C&E ultimately sold the property to 50 Industrial Park—which, again, was an LLC controlled by ARC—following Imburgio's failure to make tender by the settlement date.]

* * * *

[Appellants asserted] that [ARC, via 50 Industrial Park,] entered into [a] July 19, 2019 agreement [("the July 2019 Agreement")] with C&E [to purchase the property from C&E, notwithstanding the execution of the April 2019 Agreement by C&E and Imburgio, as well as the June 2019 letter of intent between ARC and LARC. Appellees maintained that ARC did this] in order to harm [them] by prohibiting [them] from closing under the [April 2019] Agreement[ with C&E; and Appellees further alleged that Alter also interfered with the April 2019 Agreement, or prohibited Imburgio from closing under the April 2019 Agreement, by facilitating ARC's purchase of the property from C&E. Notably, the July 2019 Agreement between 50 Industrial Park and C&E contained a rider subordinating that agreement to the April 2019 Agreement between Imburgio and C&E; more specifically, the rider to the July 2019 Agreement provided that C&E would continue to be bound by the April 2019 Agreement to sell the property to Imburgio, but, in the event that Imburgio failed to close on the April 2019 Agreement, C&S would terminate that agreement pursuant to its terms, and the July 2019 Agreement between 50 Industrial Park and C&E would be enforceable. Imburgio in fact failed to make tender by the settlement date specified in the April 2019 Agreement, *i.e.*, August 1, 2019, and C&E thereafter sold the property to 50 Industrial Park.]

* * * *

- 2 -

[Appellants] filed a [c]omplaint against [Appellees] [i]n July [] 2021. The [c]omplaint set[] forth the following counts: [c]ount I – [s]pecific [p]erformance (against C&E), [c]ount II – [b]reach of [c]ontract (against C&E), [c]ount III – [b]reach of [c]ontract (against [ARC]), [c]ount IV – [t]ortious [i]nterference with [c]ontract (against [ARC]), and [c]ount V – [t]ortious [i]nterference with [c]ontract (against Alter).

* * * *

After the close of discovery, [ARC] and Alter filed [a m]otion for [s]ummary [j]udgment . . .. C&E then filed its [m]otion for [s]ummary [j]udgment . . .. [Appellants filed responses thereto.] The [trial c]ourt heard argument on both motions . . .. After argument[,] and upon consideration of [the] briefs, the [trial c]ourt [granted summary judgment in favor of Defendants and dismissed [Appellants'] complaint. The trial court concluded LARC was not a party to, nor third-party beneficiary of, the contract; C&E did not breach the April 2019 Agreement by selling the property to 50 Industrial Park rather than selling it to Imburgio; and that ARC and Alter did not tortiously interfere with Imburgio's April 2019 Agreement with C&E.]

Trial Court Opinion, 10/12/22, at 1-8 (paragraphs re-ordered for clarity).

Appellants timely appealed, and both Appellants and the trial court complied with Pa.R.A.P. 1925.[1]

Appellants raise the following issues for our review:

1. [Whether] the trial court committed an error of law when it found that LARC was not a proper plaintiff[?]

2. [Whether] the trial court committed an error of law when it found that [ARC] and Alter did not tortiously interfere with the [April 2019] Agreement[?]

---

[1] The trial court, in lieu of an opinion pursuant to Pa.R.A.P. 1925(a), directed this Court to its October 12, 2022 memorandum and order in which it stated the reasons for its ruling. **See** Statement of Reasons, 11/15/22.

3. [Whether] the trial court committed an error of law when it found that C&E did not breach the . . . [April 2019] Agreement[?]

Appellants' Brief at 2 (unnecessary capitalization omitted).[2]

We have articulated our scope and standard of review as follows:

In reviewing an order granting summary judgment, our scope of review is plenary, and our standard of review is the same as that applied by the trial court. Our Supreme Court has stated the applicable standard of review as follows: [A]n appellate court may reverse the entry of summary judgment only where it finds that the lower court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to a judgment as a matter of law. In making this assessment, we review the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. As our inquiry involves solely questions of law, our review is *de novo*.

Therefore, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a *prima facie* cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

*Caterpillar Fin. Servs. Corp. v. Get 'Er Done Drilling, Inc.*, 286 A.3d 302, 305–06 (Pa. Super. 2022) (internal citation omitted).

_____

[2] We note with disapproval that the argument section of Appellants' brief does not correspond to the issues in the statement of questions involved. **See** Pa.R.A.P. 2119(a) (providing that "[t]he argument shall be divided into as many parts as there are questions to be argued . . .."). Appellants purport in their statement of questions involved to raise five issues; however, their argument section is divided into three main parts. **Compare** Appellants' Brief at 3-4 **with id**. at ii. We address Appellants' three main issues as presented in the argument section.

Motions for summary judgment are governed by Pennsylvania Rule of Civil Procedure 1035.2, which provides as follows:

> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law[:]
>
> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
>
> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.Civ.P. 1035.2. To survive a motion for summary judgment, the non-moving party may not rely merely upon the controverted allegations of the pleadings, "but must set forth specific facts by way of affidavit, or in some other way as provided by the rule, demonstrating that a genuine issue exists." *See Get 'Er Done Drilling*, 286 A.3d at 306.

In their first issue, Appellants maintain the trial court erred in granting summary judgment insofar as the court essentially concluded that LARC lacked standing to sue Appellees because LARC was neither a party to the contract nor a third-party beneficiary. Generally, a breach of contract can only occur between parties to the contract. *Cf. Electron Energy Corp. v. Short*, 597 A.2d 175, 178 (Pa. Super. 1991) (noting that it is "fundamental contract law that one cannot breach a contract that one is not a party to," and

concluding that there was no breach of contract where the defendant was not a party to the contract).  However, "[u]nder Pennsylvania law, . . . a person assumes third-party beneficiary status—and, as such, has standing to recover under a contract—only where both parties to the contract express an intention to benefit the third party and that intention appears in the contract."  *Konyk v. Pennsylvania State Police of Commonwealth of Pennsylvania*, 183 A.3d 981, 987–88 (Pa. 2018) (citations omitted); *see also* Restatement (Second) of Contracts § 302 (1979).

We have set forth the law on third-party beneficiaries to contracts as follows:

> In order for a third[-]party beneficiary to have standing to recover on a contract, both contracting parties must have expressed an intention that the third party be a beneficiary, and that intention must have affirmatively appeared in the contract itself.
>
> Furthermore, to be a third[-]party beneficiary entitled to recover on a contract[,] it is not enough that it be intended by *one* of the parties to the contract and the *third person* that the latter should be a beneficiary, but *both parties to the contract* must so intend and must indicate that intention in the contract; in other words, a promisor cannot be held liable to an alleged beneficiary of a contract unless the latter was within his contemplation at the time the contract was entered into[,] and such liability was intentionally assumed by him in his undertaking.

*PA Energy Vision, LLC v. S. Avis Realty, Inc.*, 120 A.3d 1008, 1015 (Pa. Super. 2015) (internal citations omitted) (emphases in original; formatting altered).  Further, "the fact that the obligee knows that he will perform the contracted-for services for a third party is not, in itself, sufficient to vest the

- 6 -

third party with standing to sue on the contract." ***Marsteller Cmty. Water***

***Auth. v. P.J. Lehman Engineers***, 605 A.2d 413, 416 (Pa. Super. 1992).

An analysis of LARC's standing—either as a party to, or third-party beneficiary of, the contract requires an examination of the contractual language, we set forth the relevant law:

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.
>
> Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

***Maisano v. Avery***, 204 A.3d 515, 520 (Pa. Super. 2019) (internal citation omitted).[3]  Lastly, "Pennsylvania courts have long recognized the general

_____

[3] As with an appeal from a grant of summary judgment, for an appeal concerning the language of a contract, our scope of review is plenary, and our standard of review is *de novo*. ***See Maisano***, 204 A.3d at 520.

- 7 -

principle of contract law providing that a material breach of a contract, which is vital to the existence of the contract, relieves the non-breaching party from any continuing duty of performance under the contract." *Umbelina v. Adams*, 34 A.3d 151, 159 (Pa. Super. 2011) (internal citations and emphasis omitted). "An interpretation will not be given to one part of the contract which will annul another part of it." *Capek v. Devito*, 767 A.2d 1047, 1050 (Pa. 2001) (internal citations and quotations omitted).

Appellants argue that the trial court erred in concluding LARC lacked standing either as a party to, or third-party beneficiary of, the contract. *See* Appellants' Brief at 28. Appellants maintain the April 2019 Agreement made clear that "C&E expressly consented to [Imburgio's] assignment of the [April 2019] Agreement to LARC and/or named LARC as a party to the [April 2019] Agreement." *Id*. However, paragraph 18 of the April 2019 Agreement, which addresses assignment, provides that the buyer is prohibited from assigning the agreement "without the written consent of Seller unless otherwise stated in this Agreement." April 2019 Agreement, 4/27/19, at ¶ 18. Appellants note the buyer is specified as "Gina Marie Imburgio *or assigns*," Appellants' Brief at 28 (emphasis in original), and an "Additional Term" at the conclusion of the contract indicated Imburgio's intent to assign the agreement. *See id*. at 28-29. According to Appellants, these two terms, together, superseded any conflicting terms in the contract such that the April 2019 Agreement "did not

limit or restrict [Imburgio's] ability to assign it to any other person or entity, including LARC." *Id*. at 29.

Appellants additionally maintain that if LARC is not a party to the contract, it is a third-party beneficiary. According to Appellants, they and C&E intended for the April 2019 Agreement to benefit LARC. Appellants cite various instances of the parties' conduct which, they assert, "consistently demonstrated the intention that LARC would purchase . . . the [p]roperty; not that [Imburgio] would purchase it in her individual capacity." *Id*. at 31-33. The evidence of the parties' conduct, Appellants argue, "creates, at a minimum, a genuine issue of material fact of whether the parties' conduct established LARC as a party to[, or third-party beneficiary of,] the . . . [April 2019] Agreement, which precluded summary judgment." *Id*. at 33.

The trial court considered these arguments and concluded they were meritless:

> [Appellants] argue that Imburgio executed the [April 2019] Agreement in her individual capacity and as the majority member of LARC and that LARC is included by virtue of the "or assigns" language after Imburgio's name in the portion of the [April 2019] Agreement identifying the parties. These arguments fail for the following reasons.
>
> Section 18 of the [April 2019] Agreement provides, in relevant part, "Buyer will not transfer or assign this Agreement without the written consent of Seller unless otherwise stated in this Agreement." Despite this provision, [Appellants] argue that C&E automatically agreed to the assignment by Imburgio to LARC because the [April 2019] Agreement identified the buyer as "Gina Marie Imburgio or assigns." However, this argument is without merit because the parties agreed to the following additional term in Section 30(B): "The Buyer intends to assign this agreement of

- 9 -

sale to a newly formed corporation of which Gina Marie Imburgio will be a principal shareholder or member." This provision negates [Appellants'] arguments alleging that it was the intent of Imburgio to assign the [April 2019] Agreement to LARC, an [already] existing LLC.

Although [Appellants] attempt to support their opposition to C&E's [m]otion for [s]ummary [j]udgment by citing Imburgio's deposition testimony and averring that it was always known by the parties that LARC was an intended beneficiary or assignee of the [April 2019] Agreement, it is not convincing to the [c]ourt because the language of the . . . [April 2019] Agreement identified above is clear and unambiguous. "When the language of a contract is unambiguous, [the court] must interpret its meaning solely from the contents within its four corners, consistent with its plainly expressed intent." ***Seven Springs Farm, Inc. v. Croker***, 748 A.2d 740, 744 (Pa. Super. 2000)[] (citations omitted). It is plainly expressed in the [April 2019] Agreement that Imburgio entered into said agreement in her individual capacity with the intent to assign the agreement to a newly formed corporation of which she would be a principal shareholder or member, and such assignment was conditioned upon the written consent of C&E. The record is devoid of any writing by C&E consenting to Imburgio's assignment of the [April 2019] Agreement to LARC. Therefore, the Court finds that LARC is an improper plaintiff with respect to the claims against C&E.

Trial Court Opinion, 10/12/22, at 3-4.

Following our review, we discern no error in the trial court's conclusion that LARC was not a party to the April 2019 Agreement. Initially, we observe that LARC is not identified in the April 2019 Agreement as a party. That agreement merely references "Gina Marie Imburgio or assigns" and indicates her intention to "assign this agreement of sale to a newly[-]formed corporation[,] which Gina Maria Imburgio will be a principal shareholder or member." April 2019 Agreement, 4/27/19, at pp. 1, 9. The April 2019

- 10 -

Agreement neither identifies LARC as a party nor as an assignee.[4] Accordingly, Appellants' argument that LARC was a party to that agreement fails. **See Maisano**, 204 A.3d at 520 (stating that the purpose of contract interpretation is to give effect to the intent of the contracting parties, which is embodied in the writing itself).

We further discern no error in the trial court's analysis vis-à-vis its determination that LARC was not a third-party beneficiary to the contract. As noted above, only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties; and in the absence of an ambiguity, the plain meaning of the agreement will be enforced. **See id**. The Agreement specifies only that the buyer is Imburgio "or assigns," and indicates Imburgio's intention to "assign this agreement of sale to a **newly[-]formed** corporation of which [she] will be a principal shareholder or member." April 2019 Agreement, 4/26/19, at pp. 1, 9 (emphasis added). However, even C&E's knowledge, based on the terms of the April 2019 Agreement, that Imburgio **intended** to assign that agreement to an

_____

[4] We further observe that, contrary to the language in the April 2019 Agreement, Imburgio did not intend to create a new corporation for purposes of an assignment of the April 2019 Agreement. **See** Gina Imburgio Deposition, 5/24/22, at 16-17, Reproduced Record ("R.") at 382a-83a. Additionally, according to Imburgio's husband, LARC was formed in 2017 or 2018, **see** Steve Imburgio Deposition, 5/13/22, at 8, R.321a; LARC member Nicholas Bardoutsos similarly testified that he became involved in LARC around August or October of 2017, **see** Nicholas Bardoutsos Deposition, 5/13/22, at 8-9, R. 341a. Thus, LARC was not a newly-formed corporation.

- 11 -

unspecified newly-formed corporation does not evince C&E's intent that the agreement benefit LARC, a pre-existing LLC. *See PA Energy Vision, LLC*, 120 A.3d at 1015 (stating that "it is not enough that it be intended by one of the parties to the contract and the third person that the latter should be a beneficiary, but both parties to the contract must so intend and must indicate that intention in the contract") (emphasis omitted); *see also P.J. Lehman Engineers*, 605 A.2d at 416 (noting that "the fact that the obligee knows that he will perform the contracted-for services for a third party is not, in itself, sufficient to vest the third party with standing to sue on the contract"). Further, Appellants' assertion that Imburgio's statement of intent to assign the April 2019 Agreement empowered her to, without restriction, assign the agreement to "any other person or entity" is untenable given it would nullify section 18, which provides, in relevant part, that "Buyer will not transfer or assign this Agreement without the written consent of Seller unless otherwise stated in this Agreement." April 2019 Agreement, 4/27/19, at ¶ 18. *See also Capek*, 767 A.2d at 1050 (providing that an interpretation will not be given to one part of the contract which will annul another part of it).[5] For the

_____

[5] As we are able to resolve this issue based on the unambiguous language of the April 2019 Agreement, we do not consider the extrinsic evidence of the parties' conduct which Appellants cite. *See Maisano*, 204 A.3d at 520 (providing that "[o]nly where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties").

foregoing reasons, the trial court did not err in granting summary judgment against LARC on all counts.

In their second issue, Appellants argue the trial court erred in granting summary judgment in favor of ARC and Alter based on its conclusion that they did not tortiously interfere with the April 2019 Agreement between Imburgio and C&E. This Court has explained that the necessary elements for a cause of action for interference with existing contractual relations are:

(1) the existence of a contractual relationship between the complainant and a third party;

(2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual damage as a result of defendant's conduct.

**Phillips v. Selig**, 959 A.2d 420, 429 (Pa. Super. 2008) (citing, *inter alia*, Restatement (Second) of Torts § 766 (1979)). While the first and fourth elements—respectively, the existence of a contractual relationship, and resulting damage stemming from the conduct—are straightforward, the other elements require elaboration. The second element "requires proof that the defendant acted for the specific purpose of causing harm to the plaintiff." **Id**. (internal citation and quotations omitted). The third element, regarding privilege or justification, requires consideration of several factors:

In determining whether an actor's conduct in intentionally interfering with a contract . . . is improper or not, consideration is

- 13 -

given to the following factors: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

*Id*. at 429–30 (internal citations omitted).  We have noted that the second and third elements are "closely related, as . . .[,] in most cases[,] the defendant's intentional conduct is done at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff . . .." *Id*. at 430 (internal citation and quotations omitted).[6]

As there are four elements **necessary** to establish a claim for tortious interference with a contract, failure to satisfy any given element is fatal to the claim.  Therefore, we limit our analysis to the second element, *i.e.*, intent to interfere with the contractual relationship.  Regarding the second element, Imburgio argues ARC and Alter created a new LLC, 50 Industrial Park, for the purpose of executing an agreement for the purchase of the same property from C&E.  **See** Appellants' Brief at 35.  Appellants maintain that ARC and

---

[6] In analyzing these factors, the issue "is whether the interference is improper or not under the circumstances; whether, upon a consideration of the . . . factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation." **Phillips**, 959 A.2d at 430 (internal citation omitted).  While "this evaluation of interests is not always susceptible of precise definition, it is clear that the central inquiry is whether the defendant's conduct is sanctioned by the 'rules of the game' which society has adopted." **Id**. (internal citation and quotations omitted).

Alter intended to harm Imburgio by interfering with her contractual relationship for the purchase of the property from C&E, as evinced by, *inter alia*, the fact that ARC and Alter negotiated with LARC for the sale of the property (which would occur following Imburgio's purchase of the property from C&E and assignment to LARC), even though ARC and Alter, via 50 Industrial Park, signed an agreement in the interim to purchase the same property directly from C&E. ***See id***. at 38-39. Appellants note that ARC and Alter "only benefitted from the . . . [July 2019] Agreement [with C&E] if [Imburgio] failed to close." ***Id***. at 42. Appellants argue ARC and Alter's subordination of their agreement with C&E to the April 2019 Agreement between C&E and Imburgio was "merely a fail-safe if the scheme [to interfere] did not work as intended." ***Id***.

The trial court considered this issue and likewise determined it was meritless. The court explained its reasoning, regarding the second element, as follows:

> . . . [ARC] and Alter aver that Imburgio has not adduced any evidence as to the second . . . element[].
>
> [Regarding the second element, Appellants] argue that [ARC] entered into the July [] 2019 [A]greement with C&E in order to harm [Appellants] by prohibiting [them] from closing under the [April 2019] Agreement. [Appellants'] argument is without merit. The July [] 2019 [A]greement contained the aforementioned rider language making it subordinate to the [April 2019] Agreement. C&E's contract with Imburgio trumped its contract with 50 Industrial Park, LLC . . ..
>
> . . . For the aforementioned reasons, summary judgment in favor of [ARC] and Alter is appropriate because Imburgio failed to

- 15 -

produce evidence of facts essential to the second . . . element[] of tortious interference.

Trial Court Opinion, 10/12/22, at 8.

Following our review, we conclude the trial court did not err in determining there was no genuine issue of material fact about the second element of tortious interference with a contractual relationship, namely, that ARC and Alter did not intend to harm Imburgio by executing the July 2019 Agreement between 50 Industrial Park and C&E. We observe that the rider to the July 2019 Agreement between 50 Industrial Park and C&E specifically recognized the validity of the April 2019 Agreement and provided that the sale from C&E to 50 Industrial Park was subordinate to the April 2019 Agreement between C&E and Imburgio, and would only occur if Imburgio failed to close. We cite the provision in relevant part as follows:

> [3(I)] Buyer [50 Industrial Park] acknowledges that Seller [C&E] has entered into that certain Agreement for the Sale of Commercial Real Estate (the "April 2019 Agreement") dated April 27, 2019 with Gina Marie Imburgio ("Imburgio") and Buyer agrees that **the terms of this Agreement are subject and subordinate to the [April 2019 Agreement]**. Seller (i) agrees not to amend, modify, waive or supplement any of the terms or provisions of the [April 2019 Agreement] without the prior written consent of Buyer, (ii) agrees that, **upon Imburgio's failure to close thereunder, Seller shall terminate the [April 2019 Agreement] in accordance with the terms thereof**, whereupon this agreement shall continue in full force and effect . . ..

Rider to July 2019 Agreement, 7/19/19, at 3(I) (emphases added).

As the rider makes clear, ARC and Alter's agreement—via 50 Industrial Park—with C&E for the sale of the property was expressly subordinated to

- 16 -

Imburgio's agreement with C&E; and, in fact, the rider required enforcement of the April 2019 Agreement pursuant to the terms of that agreement without any amendments, modifications, waivers, or supplements. The rider also required, in the event of Imburgio's failure to close on the property, termination of the April 2019 Agreement "in accordance with the terms thereof." *Id*.

Rather than incentivize C&E to breach the April 2019 Agreement, the July 2019 Agreement instead required performance of the April 2019 Agreement pursuant to its terms. Given that the July 2019 Agreement was subordinated to the April 2019 Agreement; the July 2019 Agreement required enforcement of the terms of the April 2019 Agreement; and the July 2019 Agreement was only enforceable in the event of Imburgio's failure to close under the April 2019 Agreement, we conclude that the rider demonstrates ARC and Alter lacked the intent to harm Imburgio. *See Phillips*, 959 A.2d at 429 (stating that the second element requires proof that the defendant acted for the specific purpose of causing harm to the plaintiff). As there was no genuine issue of material fact about whether the second prong of the tortious interference with a contract claim was satisfied (it was not), the trial court properly granted summary judgment in favor of ARC and Alter.

Appellants lastly assert that the trial court erred in granting summary judgment in favor of C&E on Imburgio's breach of contract claim. "It is well-established that three elements are necessary to plead a cause of action for

breach of contract: (1) the existence of a contract, including its essential terms[;] (2) a breach of the contract; and[] (3) resultant damages." ***Kelly v. Carman Corp.***, 229 A.3d 634, 653 (Pa. Super. 2020) (internal citation omitted).

Appellants maintain C&E had no intention of conveying the property to Imburgio, and they further "allege that C&E breached the [April 2019] Agreement because it refused to close and did not convey the [p]roperty to [Imburgio]." Appellants' Brief at 56. Appellants argue that Imburgio was "certainly willing to close on the [April 2019] Agreement, and whether [she was] able to close is a material fact that is in dispute and for the jury to decide." ***Id***. at 62. Appellants emphasize "the mere fact that C&E did not intend to and refused to sell the property to [Imburgio] is the breach." ***Id***. at 63 (emphasis and unnecessary capitalization omitted).

The trial court considered Appellants' assertions and concluded they were meritless:

> . . . Had Imburgio performed under the [April 2019] Agreement by purchasing the property on August 1, 2019, the subsequent contract[, *i.e.*, the July 2019 Agreement,] would have been void by virtue of the terms and conditions in its rider. . . ..
>
> . . . [P]ursuant to the terms of the [April 2019] Agreement, settlement could only have been extended by mutual written agreement of the parties. There is no written agreement . . . to extend the settlement date of August 1, 2019. Further, [Appellants] admit in their opposition brief to the motion that they never requested to extend the closing date. August 1, 2019 was the date identified in the [April 2019] Agreement[,] by which the performance of any obligations of the agreement were of the essence and were binding. Even accepting [Appellants']

- 18 -

contention that C&E did not intend to sell the property to Imburgio as fact, there is no evidence that C&E breached the [April 2019] Agreement.

Trial Court Opinion, 10/12/22, at 5-6. Additionally, C&E argues that "Imburgio did not act in any manner reasonable to facilitate the closing of the property on August 1, 2019. . . . [She] could have purchased the property by August 1, 2019 pursuant to the agreement, but failed to do so[,] and the [April 2019] Agreement . . . expired." C&E's Brief at 7. C&E emphasizes that it was only after Imburgio failed to close that C&E "ultimately sold the property to a corporation created by [ARC and Alter] on November 14, 2019." **Id**. C&E also reiterates that the agreement to sell the property to 50 Industrial Park "became effective only upon the expiration of the agreement of sale with . . . Imburgio." **Id**.

Following our review, we discern no error by the trial court. The April 2019 Agreement specified that Imburgio was to pay $1,440,000 for the property, and the settlement date was August 1, 2019. **See April 2019** Agreement, 4/27/19, at 2. The April 2019 Agreement also provided that "[t]he [s]ettlement [d]ate and all other dates and times identified for the performance of any obligations of this Agreement are of the essence and are binding." **Id**. The April 2019 Agreement also specified that "the [s]ettlement [d]ate is not extended by any other provision of this Agreement and may only be extended by mutual written agreement of the parties." **Id**. Imburgio has not shown that she attempted to tender the $1,440,000 by the settlement

- 19 -

date pursuant to the express terms of the April 2019 Agreement.[7] Accordingly, C&E was relieved of its obligation to sell her the property. *See Umbelina*, 34 A.3d at 159 (stating that a material breach of a contract, which is vital to the existence of the contract, relieves the non-breaching party from any continuing duty of performance under the contract).[8] Because Imburgio has failed to show there is a genuine issue of material fact as to whether she attempted to make a tender by the settlement date, the trial court committed no error in entering summary judgment in favor of C&E on Imburgio's breach of contract claim. *See Phaff v. Gerner*, 303 A.2d 826, 830-31 (Pa. 1973) (stating that "a dispute . . . as to whether the seller . . . can perform at

_____

[7] C&E corporate designee Jim O'Hara noted that Imburgio breached the April 2019 Agreement by failing to pay the purchase price for the property. *See* Jim O'Hara Deposition, 8/3/22, at 60-62, R.494a-96a (explaining that Imburgio failed to pay the purchase price for the property); *see also* Peter Helms Deposition, 6/14/22, at 21, 70-71, R.403a, 415a (real estate agent Peter Helms explaining that he represented buyer and seller in a dual capacity and testifying that Appellants "failed to come to the closing with the money," which was a violation of the April 2019 Agreement).

[8] While there is controversy about whether O'Hara believed the April 2019 Agreement was enforceable, *see* Jim O'Hara Deposition, 8/3/22, at 46-47, R.480a-81a (O'Hara opining that the agreement was not valid), O'Hara also testified at his deposition that, had Imburgio come up with the money by the settlement date, C&E would have closed on the deal. *See id*. at 104-05, R.538a-39a. Imburgio did not pay the $1,440,000 by August 1, 2019 or even within 30 days of that date, assuming *arguendo* that other terms in the contract permitted deposit of the funds within thirty days of the settlement date.

settlement is not relevant if the buyer fails to make a tender"). For these reasons, Appellants are due no relief.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/10/2025